**UNITED STATES of America, Plaintiff-Appellee,**

v.

**George Tom DARBY, Constantine Yamanis, Vincent Calise, and Michael Yamanis, Defendants-Appellants.**

No. 82–5840.

United States Court of Appeals, Eleventh Circuit.

Oct. 29, 1984.

Rehearings and Rehearing En Banc Denied Dec. 7, 1984.

---

Clyde M. Taylor, Jr., Tallahassee, Fla., for Darby.

Robert J. Vossler, Tallahassee, Fla., for Calise.

Joel Hirschhorn, Harry M. Solomon, Miami, Fla., for Constantine Yamanis.

Walter P. Loughlin, Newark, N.J., for Michael Yamanis.

David L. McGee, Asst. U.S. Atty., Tallahassee, Fla., for plaintiff-appellee.

Before KRAVITCH and HATCHETT, Circuit Judges, and MORGAN, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

Appellants Constantine Yamanis, Michael Yamanis, Vincent Calise and George Thomas Darby were convicted and sentenced for their involvement in a large drug smuggling operation. The issues presented on appeal are:

(1) whether Constantine Yamanis' right to a speedy trial under 18 U.S.C. § 3161(c)(1) was violated;

(2) whether the trial court's denying Constantine Yamanis' motions for continuance constituted error under 18 U.S.C. § 3161(c)(2) or an abuse of discretion;

(3) whether Constantine Yamanis was denied a fair and impartial trial as a result of the trial court's jury instructions, evidentiary rulings and discovery rulings;

(4) whether the sentences imposed on Constantine Yamanis and Michael Yamanis are so disproportionate to the crime as to constitute cruel and unusual punishment, whether Constantine Yamanis' indigency rendered the imposition of "stand committed" fines violative of the fifth amendment and whether the trial court erred in imposing cumulative fines;

(5) whether the trial court lacked personal jurisdiction over Michael Yamanis due to the circumstances of his arrest;

(6) whether the presence of information of disputed accuracy in the presentence report violated Michael Yamanis' due process rights;

(7) whether Calise was improperly sentenced as a dangerous special drug offender under 21 U.S.C. § 849 because of an untimely notice, an inadequate notice,

an insufficiently onerous standard of proof or prosecutorial vindictiveness;

(8) whether the trial court erred in prohibiting Calise from interviewing the jurors after trial;

(9) whether there is sufficient evidence of Darby's guilt to support the conviction; and

(10) whether the evidence adduced by the government established multiple conspiracies rather than a single conspiracy such that there was a variance between the allegations in the indictment and the proof at trial prejudicial to Darby or such that the trial court abused its discretion in denying Darby's motions for severance.

We affirm in all respects.

## FACTS AND PROCEEDINGS BELOW

Between 1975 and 1982, Constantine Yamanis and Michael Yamanis, brothers, headed an extensive marijuana and hashish importation organization. The bill of particulars filed by the government listed, and the evidence adduced by the government tended to show, ten major smuggling episodes for which this organization was responsible, to wit:

(1) the importation of a multi-ton shipment of marijuana at Moss Landing, California in late June and early July 1981 (the *Kyoto* episode);

(2) the importation of a multi-ton shipment of marijuana on the coast of Oregon in May 1981, and the transportation thereof from Oregon to California (the Oregon episode);

(3) the attempted transportation of two and one half tons of marijuana from Florida to Texas in December 1980 (the attempted transportation episode);

(4) the importation of a seven-ton load of marijuana aboard a DC–6 aircraft at Bascomb, Florida in July 1980, and the transportation thereof from Florida to Texas (the DC–6 episode);

(5) the importation of a multi-ton shipment of marijuana on the west coast of Florida in December 1978 (the *Draco* episode);

(6) the attempted importation of a multi-ton shipment of hashish in late 1977 and early 1978 (the *BP–25* episode);

(7) the importation of a 14-ton shipment of marijuana at Gloucester, Massachusetts in November 1977 (the *Willig* episode);

(8) the importation of a multi-ton shipment of marijuana at Gloucester, Massachusetts in late May and early June 1977 (the *Gretchen* episode);

(9) the attempted importation of a 15-ton shipment of marijuana in October and November 1976 (the *Fylke* episode); and

(10) the importation of a seven-ton shipment of marijuana at Ambrose Light, New York in early 1976 (the *Patria* episode).

The Yamanis organization was also involved in several smaller drug incidents.

The evidence at trial indicated that the Yamanises were engaged not only in the importation and off-loading of marijuana, but also in its transportation, distribution and sale. In the course of their dealings, they procured the assistance of public officials, both in this country and abroad, exchanged hostages to ensure adherence to bargains and otherwise resorted to threats of violence. Their operation literally spanned the globe, from Florida, California and New York to Colombia and Pakistan. And from their drug smuggling activities, they reaped millions of dollars.

Vincent Calise was one of the Yamanises' chief lieutenants. Having joined the organization in late 1975 or early 1976, Calise actively participated in several of the large drug transactions recounted above. In addition to performing relatively minor tasks, he often assumed a supervisory role, for example, in directing personnel engaged in off-loading. The Yamanises were also assisted by Tom Darby. Specifically, Darby participated in the DC–6 episode.

On January 7, 1982, the Grand Jury for the Northern District of Florida returned a five-count indictment charging appellants

and seven others [1] with violations of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 841–852, and the Controlled Substances Import and Export Act, 21 U.S.C. §§ 951–966. Count I charged Constantine Yamanis and Michael Yamanis with engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848. Count II charged Calise and Darby with conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. §§ 841, 846. Count III charged Calise and Darby with conspiracy to import marijuana in violation of 21 U.S.C. §§ 952, 963. Count IV charged all four appellants with importation of marijuana in violation of 21 U.S.C. § 952. And Count V charged all four appellants with possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841.

In June 1982, Constantine Yamanis, Calise and Darby were tried by a jury before Judge Lynn Higby of the Northern District of Florida. Jury selection occurred on June 1, and the trial commenced on June 7. On June 15, the jury returned verdicts finding Constantine Yamanis guilty on Counts I, IV and V, Calise guilty on Counts II, III and V, and Darby guilty on Count III. Following his transportation from Honduras to Florida in July 1982, Michael Yamanis was tried by a jury, again before Judge Higby, in October 1982. He was found guilty on Counts I, IV and V.

Constantine Yamanis and Michael Yamanis each received a 60-year prison term and a $100,000 fine on Count I, a five-year prison term, a $15,000 fine and two-year special parole term on Count IV, and a five-year prison term, a $15,000 fine and a two-year special parole term on Count V. The two five-year terms are to run consecutively to each other and concurrently with the 60-year term. The total fine is $130,-000. Calise was sentenced to a five-year prison term on Count II, a five-year prison term on Count III, and a four-year prison term on Count V, all to run consecutively;

he was also fined $15,000 on each of the three counts. Having been found to be a dangerous special drug offender under 21 U.S.C. § 849, Calise received an additional prison term of 25 years, to run concurrently with the other prison terms. As a result of his conviction on Count III, Darby was sentenced to five-years' imprisonment and was fined $15,000. This appeal ensued.

## CLAIMS

### I. CONSTANTINE YAMANIS: STATUTORY SPEEDY TRIAL

Constantine Yamanis contends that because he was denied the right to a speedy trial in violation of the Speedy Trial Act, 18 U.S.C. §§ 3161–3174, the district court should have dismissed his indictment pursuant to section 3162(a)(2) of the Act. Section 3161(c)(1) essentially provides a 70-day period within which a defendant must be brought to trial:

> In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

18 U.S.C.A. § 3161(c)(1) (Supp.1984). Under section 3161(h), however, certain periods of delay may be excluded when calculating the 70-day period:

> (h) The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence:
>
> (1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to—
>
> * * * * * *

---

1. Appellants' coindictees were Gian Carlo Beretta, Giovanni Pecunia, Don Kirshner, George Ellibee, Bill Chiari, Charlie Harris and "Will" Lnu.

Chiari and Harris were tried with Constantine Yamanis, Calise and Darby. Chiari was acquitted, and Harris was convicted on two counts.

(F) delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;

\* \* \* \* \* \*

(J) delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.

\* \* \* \* \* \*

(7) A reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted.

18 U.S.C.A. § 3161(h) (Supp.1984).

■ Our opinion in *United States v. Stafford*, 697 F.2d 1368 (11th Cir.1983), deals exhaustively with these excludable time provisions. Reading subsections (1)(F) and (J) together, the court defined three categories of excludable periods. "The first is when a pretrial motion requires a hearing. If a hearing is held, (F) by its terms excludes without qualification the entire period between the filing of the motion and the conclusion of the hearing." *Id.* at 1373 (footnote omitted). "The second situation in (F) applies to motions which result in 'prompt disposition.' For these motions, the period of exclusion begins at the filing of the motion and ends at the point of its 'prompt disposition.'" *Id.* "Prompt disposition" is defined as disposition within 30 days. *Id.* at 1373–74. "(F) apparently does not exclude time in a third situation—namely, where the motion requires no hearing and its disposition is not prompt. In this situation, however, (J) permits an exclusion of up to 30 days from the

time the motion is 'actually under advisement' by the court. This period is measured from the time that the court receives all the papers it expects from the parties." *Id.* (footnote omitted).

The *Stafford* court also commented on subsection (7):

Congress enacted this provision recognizing that multidefendant trials are desirable because they promote efficiency in the disposition of trials. If the Act imposed rigid time limits without applying exclusions to codefendants, courts would be forced to "grant severances which would otherwise not be required." *United States v. Varella*, 692 F.2d 1352, 1359 (11th Cir.1982) (quoting legislative history of Speedy Trial Act). For this reason, the rule in this Circuit is that the delay caused by one defendant is excludable as to his codefendants. *Id.; United States v. Davis*, 679 F.2d 845, 849–50 (11th Cir. 1982). This rule extends to delay caused by the filing of pretrial motions. *Varella*, 692 F.2d at 1358. *See also United States v. Edwards*, 627 F.2d 460, 461 (D.C.Cir.), *cert. denied*, 449 U.S. 872, 101 S.Ct. 211, 66 L.Ed.2d 92 (1980); *United States v. McGrath*, 613 F.2d 361, 366 (2d Cir.1979), *cert. denied*, 446 U.S. 967, 100 S.Ct. 2946, 64 L.Ed.2d 827 (1980).

697 F.2d at 1372; *see United States v. Zielie*, 734 F.2d 1447, 1453 (11th Cir.1984). As noted in *United States v. Davis*, 679 F.2d 845 (11th Cir.1982), *cert. denied*, 459 U.S. 1207, 103 S.Ct. 1198, 75 L.Ed.2d 441 (1983), however, subsection (7) contains two requirements: first, the period of delay caused by the codefendant must be reasonable, and second, as to the codefendant the time for trial must not have run and a motion for severance must not have been granted. *Id.* at 849–50.[2]

**2.** Yamanis argues that the court in *Stafford* was incorrect in stating that "delay caused by one defendant is excludable as to his codefendants," 697 F.2d at 1372, and urges us to disregard "the rule in this Circuit," *id.* Yamanis further asserts that even if the *Stafford* rule is correct, we should fashion an exception in this case. We note initially that a panel of this court lacks the authority to overrule a binding precedent such

as *Stafford;* that authority is reserved to the court sitting en banc and the Supreme Court. Second, a review of the decisions cited in *Stafford* and *Zielie,* and the legislative history quoted therein, confirms that *Stafford* accurately states the law not only as developed in this circuit, but also as originally enacted by Congress. Finally, we find nothing in the particular

To summarize, we must determine (1) whether the period between the filing of the indictment or the first appearance of the defendant, whichever came later, and the beginning of the trial exceeds the 70-day period under section 3161(c)(1); (2) if so, whether the period of delay excludable under section 3161(h) equals or exceeds the difference between the pretrial period and the 70-day period; and (3) if so, whether the period of delay excluded under section 3161(h)(7) is reasonable and otherwise qualifies for exclusion. Here 118 days elapsed between Yamanis' arraignment on February 3, 1982, which followed the filing of the indictment on January 7, 1982, and jury selection on June 1, 1982; thus the statutory limit of 70 days is exceeded by 48 days.

■■■ At least five days are excludable under section 3161(h)(1)(F). On May 26, Yamanis filed a motion for continuance, which was denied on June 1. As this denial constituted a prompt disposition of the motion, the six-day period from May 27 to June 1, inclusive, falls within the second category defined in *Stafford.* Under section 3161(h)(7), 60 additional days, perhaps more, may be excluded. Codefendant Darby filed a motion for severance on February 24; on May 6, the motion was denied without a hearing. Applying the 30-day limitation under section 3161(h)(1)(J), governing pretrial motions not promptly disposed of, *see Stafford,* 697 F.2d at 1374, we may exclude the 30 days from February 25 to March 26, inclusive. Codefendant Chiari's discovery motions, filed on March 11, were disposed of without a hearing on May 6. Having already excluded the period from March 12 through March 26, and again applying section 3161(h)(1)(J), we may exclude 30 of the remaining 41 days between March 27 and May 6. Since the

number of excludable days—no less than 66—easily exceeds 48, we must affirm if the period of delay attributed to Yamanis under section 3161(h)(7) is reasonable and otherwise qualifies for exclusion.

■■■ It is undisputed that with respect to codefendants Darby and Chiari the statutory speedy trial periods had not been exhausted prior to trial. And, of course, the trial of neither codefendant had been severed from that of Yamanis. The sole question, then, is whether the period of delay excluded under section 3161(h)(7)—more precisely, the 42-day period representing the difference between the 48-day period of excess delay and the six-day period consumed by Yamanis' motion for continuance [3]—is reasonable. We conclude that it is. In addressing this question, we employ alternative views of reasonableness, for the precise nature of the reasonableness inquiry is not entirely clear from the statute and case law.

Under one approach, reasonableness is determined with reference to the totality of the circumstances prior to trial. Thus a period of delay is reasonable under section 3161(h)(7) if it appears necessary in order for the trial court to dispose of the underlying motions, *cf. United States v. Varella,* 692 F.2d 1352, 1358 (11th Cir.1982) (equating reasonableness with "the propriety of delay as to those defendants whose motions were pending"), *cert. denied,* —— U.S. ——, 103 S.Ct. 3542, 77 L.Ed.2d 1392, —— U.S. ——, 104 S.Ct. 127, 78 L.Ed.2d 124 (1983), "for the court to conduct previously scheduled trials," *Davis,* 679 F.2d at 850, or "for [codefendants] to obtain new counsel," *id.* We cannot say that the 42-day period at issue was not necessary in order for the

circumstances of this case warranting an exception.

3. Insofar as the reasonableness requirement constitutes a restriction on the exclusion of time under section 3161(h)(7)—not a restriction on the exclusion of time under other provisions and not an independent restriction on the expenditure of time on pretrial motions—we focus on the 42 days of delay which resulted from the codefendants' pretrial motions and which must

be attributed to Yamanis in order to satisfy the statute. Only the period of delay necessarily excluded under section 3161(h)(7) is relevant, so we are not concerned with the total time actually excluded, 48 days, the total excludable time, at least 66 days, the entire period between the first appearance and trial, 118 days, or the time lapsing between the filing and disposition of the codefendants' motions.

district court thoroughly to consider and rule on the codefendants' motions. In addition, there were significant problems of representation, particularly with regard to Yamanis and Calise, which justified further delay.

Reasonableness may also be judged in terms of prejudice to the defendant. The *Davis* court, for instance, emphasized that the defendant's "ability to defend himself was not prejudiced by this delay." 679 F.2d at 850. Similarly, there is no contention, nor is there any indication in the record, that the 42-day delay in this case impaired Yamanis' defense at trial. Yamanis does argue that he was prejudiced in that he suffered prolonged pretrial incarceration. We conclude, however, that any prejudice in this sense was insufficient to render the period of delay unreasonable.

Finally, examination of the periods of delay held excludable under section 3161(h)(7) in other cases confirms our conclusion that the 42-day period in question was not unreasonable. The court determined that a 59-day delay was reasonable in *Davis*, 679 F.2d at 850, while in *Varella*, the court made a similar determination in connection with a 4-month delay, 692 F.2d at 1359. Finding the period of delay excluded in this case reasonable in every respect,[4] we hold that Yamanis' statutory right to a speedy trial was not violated and that the district court properly refused to dismiss the indictment.

## II. CONSTANTINE YAMANIS: CONTINUANCE

Constantine Yamanis challenges the district court's denials of his motions for continuance on two grounds: first, that the denials were erroneous under 18 U.S.C. § 3161(c)(2), and second, that the denials

constituted an abuse of discretion as a result of which he was denied due process.

Yamanis was arraigned on February 3, 1982, at which time he was represented by Stephen Heiser, a retained attorney. On May 10, Heiser withdrew due to a conflict of interest, and the district court appointed the Public Defender to represent Yamanis. Because of a conflict of interest on the Public Defender's part, the court appointed E.C. Deeno Kitchen, a private attorney, as counsel for Yamanis on May 11. Jury selection took place on June 1, and the trial was recessed until June 7. Yamanis moved for continuances on May 26 and June 7; both motions were denied.

### A. *Error Under 18 U.S.C. § 3161(c)(2)*

Section 3161(c)(2) of the Speedy Trial Act provides:

Unless the defendant consents in writing to the contrary, the trial should not commence less than thirty days from *the date on which the defendant first appears through counsel* or expressly waives counsel and elects to proceed pro se.

18 U.S.C.A. § 3161(c)(2) (Supp.1984) (emphasis added). Yamanis asserts that the statute "contemplates the date when a defendant first appears through an attorney who undertakes the responsibility for preparing the case for trial." Terming Heiser's representation at the arraignment a "technical" appearance, he urges us to treat Kitchen's appointment on May 11 as the first appearance.

In support of his claim, Yamanis cites the Ninth Circuit's decision in *United States v. Daly*, 716 F.2d 1499 (9th Cir. 1983), *cert. dismissed*, —— U.S. ——, 104 S.Ct. 1456, 79 L.Ed.2d 773 (1984). There

---

**4.** We also reject Yamanis' assertion that the excluded period is unreasonable in that the delay "was the result of a combination of the District Court's and Government's failure to abide by the mandate of 18 U.S.C. § 3161(c)(1) to provide Appellant with his statutorily protected right to a speedy trial, compounded by the filing of totally unrelated motions by co-defendants who are not even charged in Count I, the most serious of all those counts alleged in the Indict-

ment." Asserting that the court and the government failed to adhere to the provisions of section 3161(h)(7) merely begs the question. Moreover, requiring that the motions at issue relate to the defendant or that the codefendants be charged with equally grave offenses would thwart the intent of Congress, *i.e.*, not to upset existing severance rules, *see Stafford*, 697 F.2d at 1372; *Zielie*, 734 F.2d at 1453.

the court examined the legislative history underlying section 3161(c)(2) and determined that "the provision was meant to guarantee a minimum period of thirty days for the preparation of the defense." *Id.* at 1504. Underscoring "Congressional concern ... that a defendant be given a *reasonable* time to obtain counsel and that counsel be provided a reasonable time to prepare the case," *id.* at 1505 (emphasis in original), the court stated:

> To fulfill this policy, the 30-day period should commence only after the indictment or information has been filed and made public and the defendant has first appeared with counsel engaged or appointed to represent him at trial. We therefore hold that the 30-day period begins to run when an attorney appears on a defendant's behalf after the indictment or information has been filed, unless there is an indication that the attorney is appearing only for a limited purpose and will not further represent that defendant at trial. If the attorney has been appointed to represent the defendant only for a specific pre-arraignment purpose or at the time of his initial appearance or prior to the filing of the indictment or information disavows his intent to represent the defendant further, the period will not commence because the statutory purpose of the 30-day delay would not be fulfilled.

*Id.* At the bail hearing in *Daly*, one of the appellants was represented by an attorney "appointed only for that purpose," *id;* two other appellants were represented by attorneys who "undertook preparation of the defense from the date of that hearing," *id.* Because the former appellant's attorney

was "explicitly appointed," *id.* at 1504, for the limited purpose of representing him at the bail hearing, the court held that the 30-day period did not commence until the later appearance of appointed trial counsel. *Id.* at 1505.

We are reluctant to adopt the Ninth Circuit's reading of section 3161(c)(2), for it ignores the plain meaning of the phrase "first appears through counsel." When employing the term "first," Congress presumably did not have *subsequent* appearances in mind. More important, the absence of any qualification on the term "counsel" indicates that Congress did not have a *particular* type of counsel in mind. We find no basis in the language of the statute for concluding that by "counsel" Congress meant "trial counsel," "last retained or appointed counsel," or "counsel engaged or appointed to represent [the defendant] at trial." Nor does the legislative history of the provision require such a conclusion. It is clear, as the *Daly* court pointed out, that Congress intended section 3161(c)(2) to provide a minimum period for preparation. It is equally clear, however, that this measure alone, even as interpreted in *Daly*, cannot ensure adequate preparation time in every case, and that it was not intended to do so. Recognizing that the statute only partially addresses "Congressional concern" about the adequacy of preparation and that Congress inevitably relied on the trial judge's discretion to grant a continuance where necessitated by the circumstances of counsel's retention or appointment, we conclude that a literal construction of section 3161(c)(2) is consistent with its legislative purpose.[5]

---

5. Furthermore to the extent that the interpretation urged by Yamanis would enable defendants to postpone their prosecutions by simply changing lawyers or by retaining lawyers only for limited purposes prior to trial, it would contravene the major purpose of the Speedy Trial Act, *i.e.,* avoiding unnecessary delay. Finally, our construction of the provision is consistent with that of the Fourth Circuit. In *United States v. Wooten,* 688 F.2d 941 (4th Cir.1982), the court stated, "What section 3161(c)(2) does is simply to guarantee to the criminal defendant the right to a delay of at least thirty days *between ar-*

*raignment and trial* in any circumstances." *Id.* at 951 (emphasis added); *see also United States v. Mers,* 701 F.2d 1321, 1333–34 (11th Cir.) (quoting *Wooten* with approval), *cert. denied,* — U.S. ——, 104 S.Ct. 481, 78 L.Ed.2d 679, — U.S. ——, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983).

Even if we were to adopt the Ninth Circuit's approach, we would nevertheless reject Yamanis' claim, for we cannot accept his characterization of Heiser's representation. In his brief on appeal, Yamanis dismisses Heiser's arraignment appearance as merely "technical," and he calls Heiser's appearance at a later bond hearing "a

For purposes of section 3161(c)(2), Yamanis first appeared through counsel at his arraignment on February 3. Inasmuch as the trial commenced some four months later, we conclude that the statutory requirement was satisfied. Accordingly, we hold that the district court did not err under section 3161(c)(2) in denying Yamanis' motions for continuance.

### B. *Abuse of Discretion Resulting In Denial of Due Process*

 In *Avery v. Alabama*, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940), the Supreme Court observed:

> In the course of trial, after due appointment of competent counsel, many procedural questions necessarily arise which must be decided by the trial judge in light of facts then presented and conditions then existing. Disposition of a request for a continuance is of this nature and is made in the discretion of the trial judge, the exercise of which will ordinarily not be reviewed.

*Id.* at 446, 60 S.Ct. at 322; *see Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964). As the predecessor of this court pointed out in *United States v. Uptain*, 531 F.2d 1281 (5th Cir. 1976):

A motion for a continuance is addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless there is a showing that there has been an abuse of that discretion. This issue must be decided on a case by case basis in light of the circumstances presented, particularly the reasons for continuance presented to the trial court at the time the request is denied.

*Id.* at 1285–86 (citations omitted); *see United States v. Marquardt*, 695 F.2d 1300, 1302 (11th Cir.), *cert. denied*, 460 U.S. 1093, 103 S.Ct. 1793, 76 L.Ed.2d 360 (1983); *United States v. Jimenez-Diaz*, 659 F.2d 562, 567 (5th Cir. Unit B 1981), *cert. denied*, 456 U.S. 907, 102 S.Ct. 1754, 72 L.Ed.2d 164 (1982).

 The reasons for a continuance asserted below generally relate to the adequacy of the time available for preparation.[6] In support of the May 26th motion, defense counsel noted that he had been appointed 15 days earlier and that the trial was scheduled to commence in seven days and to recommence in 14 days. Emphasizing that the case was "enormously complex" and "most serious in nature," that discovery had not been completed and that his client's incarceration limited opportunities to confer, counsel declared, "considerable work in the way of investigation and

---

limited 'special appearance.'" The implication throughout is that Heiser was not engaged to represent him at trial. The record, however, does not support Yamanis' version of the facts. Heiser entered a *general* appearance by notice of appearance filed February 3, 1982. At the arraignment that day, Heiser neither explicitly nor implicitly disavowed his intent to represent Yamanis at later stages, including trial. And at the hearing during which he sought to withdraw, Heiser in no way suggested that he had been hired for limited purposes; he merely stated that in fact he had rendered no services except in connection with bail. Indeed, if he had been hired for the sole purpose of representing Yamanis at the arraignment and the bond hearing, it is unclear how Heiser was later put in the position of having to withdraw as trial counsel on conflict grounds. Under *Daly*, counsel is presumed to have been engaged or appointed to represent the defendant at trial "unless there is an indication that the attorney is appearing only for a limited purpose and will

not further represent that defendant at trial." 716 F.2d at 1505. There is no such indication in this case.

**6.** In his brief on appeal, Yamanis contends that by virtue of time and geographic limitations, neither he nor potential witnesses were accessible to counsel. When claiming that a continuance is necessary in order to interview and procure the presence of potential witnesses,

> [a] movant must show that due diligence has been exercised to obtain the attendance of the witness, that substantial favorable testimony would be tendered by the witness, that the witness is available and willing to testify, and that the denial of a continuance would materially prejudice the defendant.

*United States v. Uptain*, 531 F.2d 1281, 1287 (5th Cir.1976) (quoting *United States v. Miller*, 513 F.2d 791, 793 (5th Cir.1975)). As Yamanis utterly failed to meet this rather stringent standard, we concentrate on his general lack of preparation claim.

preparation must yet be done prior to being adequately prepared for trial."

In the *Uptain* opinion, the court listed a host of considerations bearing on a claim of this sort:

We have deemed the following factors highly relevant in assessing claims of inadequate preparation time: the quantum of time available for preparation, the likelihood of prejudice from denial, the accused's role in shortening the effective preparation time, the degree of complexity of the case, and the availability of discovery from the prosecution. We have also explicitly considered the adequacy of the defense actually provided at trial, the skill and experience of the attorney, any pre-appointment or pre-retention experience of the attorney with the accused or the alleged crime, and any representation of the defendant by other attorneys that accrues to his benefit.

531 F.2d at 1286–87 (footnotes omitted). Applying the pertinent factors[7] to the facts presented, we conclude that the district court did not abuse its discretion in denying Yamanis' motions for continuance.

Though relatively straightforward from a legal standpoint, the case was factually complicated, to be sure. And inasmuch as the withdrawals of his previous counsel were occasioned by conflicts of interest, Yamanis was not entirely responsible for shortening his last appointed counsel's preparation time. On the other hand, as the district court stated "for the record" at the hearing regarding the appointment of counsel on May 10, 1982, "it would appear that all this confusion concerning lawyers has been generated at least in part by the defendants, notwithstanding the warning of the court back in February of 1982 that you should get you a lawyer and get on with the defense of your case." In addi-

tion, Yamanis' trial counsel was afforded considerable time for preparation: over three weeks elapsed between Kitchen's appointment on May 11 and jury selection on June 1, and Kitchen had almost a full month before the first witness testified on June 7. With respect to discovery from the prosecution, the district court ordered the government to furnish Kitchen with all previously disclosed material. Even if, as Kitchen asserted on May 26, some discovery material had not yet been made available, there is no indication that the government did not subsequently comply or that the government's noncompliance was prejudicial.

Turning to the adequacy of the defense actually provided at trial, we note that Yamanis identifies no seriously prejudicial flaws in Kitchen's performance which may be attributed to the absence of a continuance. And although he had no previous familiarity with his client or the crimes, Kitchen was an experienced criminal trial attorney, even by Yamanis' account. In addition, Kitchen evidently had the benefit of the earlier representation of Yamanis and his codefendants by other lawyers, for the district court ordered the clerk to furnish him with all pleadings, including discovery motions and responses, and according to the May 26th motion, he consulted with several attorneys of record.

Departing from the considerations cataloged in *Uptain*, we recognize that the district court was considerate of Yamanis' interests in its scheduling of the trial and in its handling of the case in general. When allowing Heiser to withdraw as counsel, the court immediately granted a three-week continuance. Even though his eligibility for appointed counsel was questionable, the court, "in an abundance of caution, declared Mr. Yamanis entitled to appointed

---

7. Citing *United States v. Aviles,* 623 F.2d 1192 (7th Cir.1980), Yamanis contends that a trial court's exercise of its discretion must entail consideration of the factors enumerated in 18 U.S.C. § 3161(h)(8). A trial court may run afoul of the Speedy Trial Act by *granting* a continuance without heeding subsection 3161(h)(8), but that provision does not control

our review of a trial court's *denying* a motion for continuance. Subsection (h)(8) governs only the extent to which delay caused by a continuance may be excluded from the speedy trial computation. In addressing the distinct issue whether the denial of a motion for continuance violated the defendant's due process rights, we draw on the list of factors in *Uptain.*

counsel and temporarily appointed the Public Defender to represent him." As pointed out above, when Kitchen was substituted as counsel, the court arranged for him to receive all discovery material and pleadings.

Having reviewed the particular circumstances of this case, we conclude that Yamanis has failed to make the requisite showing that the absence of a continuance seriously prejudiced him. *See Jimenez-Diaz,* 659 F.2d at 567. Hence we hold that the district court's denials of his motions for continuance did not constitute an abuse of discretion and were not so arbitrary as to violate the due process clause.

## III. CONSTANTINE YAMANIS: FAIR AND IMPARTIAL TRIAL

Combining several discrete claims under a single heading, Constantine Yamanis maintains that he was denied a fair and impartial trial as guaranteed by the fifth and sixth amendments. Addressing these claims separately and together, we find no reversible error.

### A. *Jury Instructions*

As part of its preliminary instructions to the jury, the district court stated:

> You will have ample time to deliberate your verdict once everything is finished. That is, as you well know, there is always two sides to every story. For that reason, you should keep an open mind and not form or express any opinions about the case.

Yamanis argues that this instruction "had the effect of shifting the burden to Appellant to prove his innocence ... and 'challenged' the accused to offer evidence (or at least 'explain' his 'side of the story' to the jury)."

■■■ Since Yamanis failed to object to the instruction at trial, we review this claim under the plain error standard. Fed. R.Crim.P. 52(b); *see United States v. Wolfe,* 611 F.2d 1152, 1153 (5th Cir.1980). Although language other than "there is always two sides to every story" might have been preferable, read in context, the passage quoted merely exhorts the jury not to decide the case prematurely. Given that the jury was repeatedly charged on the government's burden of proof, we conclude that the instruction in question was not plainly erroneous.

### B. *Evidentiary Rulings*

■■■ Yamanis contends that the testimony of three government witnesses was inadmissible under Rules 403 and 404(b) of the Federal Rules of Evidence. Dominick Grillo, a New York City narcotics detective, testified to a meeting at which Michael Yamanis agreed to sell him 35 tons of marijuana. Constantine Yamanis asserts that the evidence was irrelevant and prejudicial, and therefore should have been excluded under Rule 403.

Again, as Yamanis made no objection at trial, we apply the plain error standard. Fed.R.Crim.P. 52(b); *see Wolfe,* 611 F.2d at 1153. To the extent that the event described by Grillo may be viewed as an overt act in furtherance of the charged conspiracies or as one in a continuing series of violations for continuing criminal enterprise purposes, the testimony appears to have been relevant. Moreover, insofar as Constantine Yamanis was not directly implicated in the transaction, the testimony was not particularly prejudicial. We therefore conclude that the admission of Grillo's testimony did not constitute plain error under Rule 403.[8]

■■■ Yamanis next challenges the testimony of Bill Gant regarding codefendant Harris' involvement in cocaine trafficking. Yamanis argues that the evidence was

---

8. Nor was it plain error under Rule 404(b) or Rule 802, as Yamanis suggests. In his brief, he correctly states that "the testimony obviously had no application to Appellant, since it focused entirely on his brother." Because the testimony recounted only an extrinsic offense committed by Michael Yamanis and thus related only to Michael Yamanis' character, Constantine Yamanis has no Rule 404(b) claim. And since the testimony arguably was not hearsay, as defined in Rule 801(c) and (d)(2)(E), its admission was not plainly erroneous under Rule 802.

used to prove his character in order to show his propensity to commit the crimes charged and thus was inadmissible under Rule 404(b).[9] Gant testified that he had known Harris for twelve years and that he had transported cocaine and money to and from Miami for Harris on numerous occasions starting in the spring of 1980. In his brief on appeal, Yamanis asserts, "The implication of all this testimony ... was that Appellant and his brother ... were behind each and every drug transaction which the witness described." However, at no point in his testimony did Gant identify Yamanis as having been involved in the cocaine operation. Indeed, Yamanis was implicated only in that Harris and others involved in the cocaine operation were also associated with the Yamanis marijuana importation organization. Because Gant's testimony regarding the cocaine operation was not probative of Yamanis' character, we conclude that the disputed evidence is not covered by the prohibition in Rule 404(b) and hence was not inadmissible with respect to Yamanis.

■ The third government witness whose testimony Yamanis challenges is Spiro Anthanasiades. He testified that while in jail in Miami, he was visited by a lawyer associated with the Yamanises. The prosecutor and the witness then had the following exchange:

Q. What did he tell you? What was the message?

A. He told me to be quiet, take it easy, because he say they know where my brother is at.

Q. Who knows where your brother is at?

A. He didn't say, sir, but he didn't mention any names.

Q. What was your response to that?

A. I got mad at him.

At this point, counsel for appellant Darby moved for a mistrial.

Although there was no such objection at trial, Yamanis now maintains that Antha-nasiades' testimony was inadmissible hearsay. In particular, he asserts that the lawyer's statement was not an admission by a party-opponent under Rule 801(d)(2)(D) and (E) since it neither concerned a matter within the scope of the lawyer's agency, if any, nor furthered the conspiracy. We need not address the applicability of the non-hearsay provisions of Rule 801(d)(2), for we conclude that the statement in question does not fall within the basic definition of hearsay in Rule 801(c). In order to constitute hearsay, a statement must be "offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Here the matter asserted by the out-of-court declarant was that "they" knew where the witness' brother was. It is evident that the statement was offered by the government not to establish that the Yamanises actually knew the whereabouts of Anthanasiades' brother, but to show the impact of the making of the statement, whether true or false, on Anthanasiades' inclination to tell the truth. For this reason, Anthanasiades' testimony was not inadmissible under the hearsay rule.

Yamanis also contends that the testimony should have been excluded under Rule 403. As suggested above, the government evidently introduced the conversation between Anthanasiades and the lawyer in an effort to bolster the witness' credibility, which had been called into question on cross-examination. The government presumably sought to demonstrate the witness' resolve to testify truthfully as reflected by his angry response to the lawyer's statement. Although the conversation might have been regarded by the jury as having instead motivated the witness to lie, either in the government's favor or in the defendant's favor, and thus was not conclusive on the issue of credibility, we cannot say that the testimony was irrelevant. Insofar as its probative value was not substantially outweighed by any preju-

---

**9.** Rule 404(b) reads in part, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Fed.R. Evid. 404(b).

dicial effect, the testimony was not inadmissible under Rule 403.

### C. *Discovery Rulings*

■ Finally, Yamanis maintains that the district court erred in refusing defense counsel access to material purportedly discoverable under the Jencks Act, 18 U.S.C. § 3500. The material at issue consisted of 19 pages of a statement given by Charles Etheridge, a government witness. After inspecting the statement *in camera,* the court found that "the matters in there are irrelevant and immaterial and does not contain any impeachment material, either *Brady* or *Giglio,* and so that I find that as a matter of fact the government's refusal to disclose the matter as Jencks Act material is well taken." "It is the primary duty of the trial judge to determine the producibility of a statement under the Jencks Act. Although his ruling is subject to appellate review, it is sustainable unless clearly erroneous." *Matthews v. United States,* 407 F.2d 1371, 1376 (5th Cir.1969) (citation omitted), *cert. denied,* 398 U.S. 968, 90 S.Ct. 2177, 26 L.Ed.2d 554 (1970); *see United States v. Cathey,* 591 F.2d 268, 274 (5th Cir.1979); *Lloyd v. United States,* 412 F.2d 1084, 1088 (5th Cir.1969). Having examined Etheridge's statement, we cannot say that the district court's findings are clearly erroneous. Indeed, we are in complete agreement with the court's ruling.

■ Viewing the district court's instructions and various rulings in combination, we hold that Constantine Yamanis was not denied a fair and impartial trial.

### IV. CONSTANTINE YAMANIS AND MICHAEL YAMANIS: SENTENCES

Constantine Yamanis and Michael Yamanis raise three claims in connection with their sentences. Each contends that his sentence is barred by the eighth amendment in that it is disproportionate to his crime. In addition, Constantine Yamanis argues that by virtue of his indigency, the imposition of "stand committed" fines violated the due process clause. And according to both, the district court erred in imposing fines exceeding the maximum under 21 U.S.C. § 848. We reject all of these claims.

### A. *Proportionality*

The range of penalties for engaging in a continuing criminal enterprise are set out in 21 U.S.C. § 848(a). Section 848(a)(1), under which appellants were sentenced, provides:

> Any person who engages in a continuing criminal enterprise shall be sentenced to a term of imprisonment which may not be less than 10 years and which may be up to life imprisonment, to a fine of not more than $100,000, and to the forfeiture prescribed in paragraph (2).

21 U.S.C.A. § 848(a)(1) (1981). In addition to their sentences for importation (Count IV) and possession (Count V), appellants were each sentenced to 60 years' imprisonment and fined $100,000 for engaging in a continuing criminal enterprise (Count I). Underscoring their advanced years (late forties and late fifties) and the unlikelihood of parole, they contend that their punishment does not fit their crime and urge us to remand for resentencing.

■ We note initially that the scope of our review is greatly restricted. As the Supreme Court made clear in *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), it is not normally the role of an appellate court to second-guess the trial judge's determination of an appropriate sentence. Rather, an appellate court must determine only whether the sentence imposed is so grossly disproportionate to the crime as to constitute cruel and unusual punishment. *Id.* at 3009 n. 16. As the Court pointed out in *Rummel v. Estelle,* 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), "Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." *Id.* at 272, 100 S.Ct. at 1138; *see also United States v. Phillips,* 664 F.2d 971, 1043 (5th Cir. Unit B 1981) (affirming sentences of 64, 53 and 33 years under section 848 and other provisions with observation that

"proportionality principle might be applicable in an 'extreme example'"), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982); *United States v. Valenzuela,* 646 F.2d 352, 354 (9th Cir. 1980) (affirming life sentence under section 848 with similar observation).

Furthermore, we are mindful of the Supreme Court's admonition in *Solem:*

> Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals.

103 S.Ct. at 3009. In a footnote, the Court added:

> In view of the substantial deference that must be accorded legislatures and sentencing courts, *a reviewing court will rarely be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate.*

*Id.* at 3009 n. 16 (emphasis added).

Nevertheless, in our opinion this is one of those rare cases in which "extended analysis" of a proportionality claim may be useful, if not required. We reach this conclusion partly because section 848, like the recidivist statutes involved in *Rummel* and *Solem,* prescribes enhanced penalties in addition to those imposed for the underlying substantive crimes. We also note that this court has not heretofore conducted a *Solem* proportionality analysis in the context of section 848. In light of both the unusual nature of section 848 and the lack of precedent in this circuit on the proportionality issue, we proceed to apply the *Solem* proportionality analysis to this case.

■■■ In *Solem,* the Court specified three factors governing proportionality review:

> [A] court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.

103 S.Ct. at 3010–11. Applying these factors in the instant case, we conclude that appellants' sentences comport with the eighth amendment.

The 60-year prison terms which appellants received under section 848 certainly constitute severe punishment.[10] The crime for which they were sentenced, however, was particularly grave. In reaching this conclusion, we focus not only on the offense as generally defined in the statute, but also on the offense as actually committed by appellants.[11] With respect to both,

---

**10.** In his brief, Michael Yamanis characterizes his sentence under section 848 as "a sentence of life imprisonment without possibility of parole." Constantine Yamanis goes one step further, referring to his sentence as "a life (or death) sentence" and as "a death sentence." Without question, the probability that a defendant will spend the rest of his life in prison is a relevant consideration. In *Solem,* the Court emphasized this probability in distinguishing *Rummel. See* 103 S.Ct. at 3013. This probability, moreover, would indicate that a 99-year prison term is not significantly worse than a 60-year prison term. On the other hand, the characterization of a sentence as life imprisonment or death on account of this probability could be misleading, as in the case of an aged or ill misdemeanant given 90 days in jail. In concluding that their sentences are severe, we recognize the distinct possibility that appellants will not survive the duration of their prison terms. We decline, however, to employ their potentially misleading terminology.

**11.** The *Solem* Court's discussion of the courts' competency to judge the gravity of an offense implies that the reviewing court should concentrate on the abstract offense charged instead of the specific facts of the case. Making judgments similar to those made by the legislature in the first instance, 103 S.Ct. at 3011, the court is to compare "the severity of different crimes on a broad scale," *id.,* thereby avoiding "the difficulties courts face in attempting to draw distinctions between similar crimes," *id.* Employing "generally accepted criteria," *id.,* the court may distinguish, for example, petty theft from grand theft, simple assault from assault with intent to murder, robbery from armed robbery, and assault with intent to commit rape from rape. The implication is that the court should avoid comparisons between different in-

we apply several of the generally accepted criteria for determining the gravity of an offense articulated in *Solem,* including "the harm caused or threatened to the victim or society," 103 S.Ct. at 3011, "[t]he absolute magnitude of the crime," *id.,* the use of "violence or the threat of violence," *id.,* "the culpability of the offender," *id.,* whether the defendant was the principal, and whether the crime was completed, *id.*

The general offense, engaging in a continuing criminal enterprise, is the most serious of all the drug-related offenses proscribed in Title 21. First, to the extent that it entails a series of violations—not an isolated transaction—the concerted effort of at least six persons—not the independent action of a single individual or the concerted effort of as few as three persons—and, especially, the element of organization, the offense is more serious than the others in that it poses a greater danger to society. The offense is also more serious in terms of the defendant's culpability, for the statute requires that the defendant occupy an organizational, supervisory or managerial position. Indeed, the gravity of the offense is reflected by its role in the sentencing scheme established by the Comprehensive Drug Abuse Prevention and Control Act of 1970. The legislative history of the Act reveals that

> [t]his section 408 [21 U.S.C. § 848] is the only provision of the bill providing minimum mandatory sentences, and is intended to serve as a strong deterent to those who otherwise might wish to engage in the illicit traffic, while also providing a means for keeping those found guilty of violations out of circulation.

H.Rep. No. 1444, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.Code Cong. & Ad.News 4566, 4576.

Although section 848 could perhaps be applied to "mild" criminal activity, *id.* at 4652, a review of the record confirms that the actual continuing criminal enterprise in which appellants were engaged was severe. With respect to the harm to society, we are struck by the immensity of the Yamanis organization. The operation was worldwide in scope, resulting in the importation, by sea and by air, of marijuana on both coasts and the subsequent transportation and distribution of marijuana in several states. The major smuggling incidents number ten or more, and the persons with whom appellants acted in concert number in the dozens, if not hundreds.[12] Moreover, in the course of seven years appellants dealt not with relatively minor amounts of marijuana and hashish, but with literally tons of it. Thus in terms of magnitude, the crime was most serious. The offense at issue was also marked by the use of violent threats. A number of witnesses testified to appellants' practice of exchanging hostages to guarantee the cooperation of other parties. Specifically, they testified that appellants threatened to kill or maim their hostages in the event of complications. Witnesses also related incidents in which appellants' subordinates were threatened with violence. In addition to such threats, the enterprise evidently entailed the corruption of public officials here and in other countries. As for culpability, the evidence consistently points to appellants as the peerless leaders of the organization. Nor were their roles passive ones, for they were involved in the direction of all but the most ministerial aspects of the operation.[13] It

---

stances of the same offenses, lest its determination of relative severity become overly subjective.

That notwithstanding, *Solem* should not be read as prohibiting the reviewing court from examining the particular circumstances of the crime. Although it focused primarily on the offense charged—uttering a "no account" check—the Court in *Solem* did consider at least one fact peculiar to the case—"[t]he $100 face value of Helm's 'no account' check." 103 S.Ct. at 3012-13. *Solem* is better read as merely

counseling against subjectivity in appraising the gravity of an offense. So long as gravity is judged in terms of accepted principles, the court may consider the crime actually committed as well as the crime generally proscribed.

12. Indeed, at Michael Yamanis' sentencing, the district court referred to "several hundred others probably involved in the organization."

13. Comparing himself to an ordinary drug courier or "mule," Michael Yamanis asserts that inasmuch as he merely transported the marijuana,

follows, of course, that neither appellant was a mere accessory after the fact, and although not every importation episode was entirely successful, appellants' overall crime was by no means a mere attempt.

From our examination of the statute and the facts of this case, we conclude that the offense in question was of the utmost gravity. At this point, we do not view the punishment imposed incommensurate.

Turning to the second step of the analysis in *Solem*, we consider "the sentences imposed on other criminals in the same jurisdiction." 103 S.Ct. at 3011. For this purpose, we are concerned with the sentences imposed not just in the Northern District of Florida, but in the jurisdiction of the United States as a whole.[14] Considering first the sentences imposed for other federal offenses, we find no indication that the punishment at issue is excessive. Specifically, we can identify no crime which is necessarily more serious, but which is sub-

ject to the same or a less severe penalty.[15] As for the sentences imposed on other defendants under section 848, again we find no significant disparity. Indeed, in several recent cases involving continuing criminal enterprises comparable to the one before us the defendants received prison terms in the same range as those given appellants. *See, e.g., United States v. Garrett,* 727 F.2d 1003 (11th Cir.1984) (defendant sentenced to 40 years' imprisonment under section 848); *United States v. Kirk,* 723 F.2d 1379 (8th Cir.1983) (defendant sentenced to 40 years' imprisonment under section 848), *cert. denied,* — U.S. —, 104 S.Ct. 1717, 80 L.Ed.2d 189 (1984); *Phillips, supra* (defendants sentenced to 64, 53 and 33 years' imprisonment under section 848 and other provisions); *United States v. Webster,* 639 F.2d 174 (4th Cir.) (defendant sentenced to 50 years' imprisonment under section 848), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981), *modified,*

he was less culpable than the unprosecuted buyers and sellers who actually owned it. The problem with this argument is two-fold. First, where the gravamen of a crime is the importation of a controlled substance, as here, that party responsible for the importation, *i.e.,* the party who "merely transported" the controlled substance into the country, is fully culpable. Second, the record does not support appellant's contention that he only provided transport services. While the evidence does not show the passage of title from one party to the next, incidents such as appellants' negotiations with Detective Grillo for the purchase and sale of several tons of marijuana belie his contention.

**14.** Focusing on individual sentencing decisions, both the government and appellants regard the Northern District of Florida as the "same jurisdiction" under step three. This approach, however, ignores the *Solem* Court's consideration of legislative judgments, especially its attention to the judgments of legislatures other than the one responsible for the statute under which Helm had been sentenced. After comparing a particular legislative judgment with other legislative judgments in South Dakota, the Court assessed the consistency of the particular legislative judgment with legislative judgments in other states. The approach advocated by the parties, by contrast, would restrict the analysis to the judgments of a single legislature, Congress, thereby eliminating the distinction between the second and third steps. In our opinion, viewing the United States as the "same jurisdiction" and

various states as the "other jurisdictions" better corresponds with the analysis in *Solem.* We see no reason to attach special significance to the sentences imposed by a particular district court, nor is there any bar to considering the sentences imposed in the several states.

In defining the pertinent jurisdictions, we have emphasized the role of legislative judgments in the *Solem* Court's review. Having done so, we hasten to add that our attention to legislative judgments, state or federal, is limited in this case because of the peculiar nature of section 848. *See infra,* note 15 and pp. 501–502. Accordingly, the discussion that follows concentrates on individual sentencing decisions in the federal courts.

**15.** Our inquiry in this regard is complicated by the fact that those offenses for which 60 years to life imprisonment may be imposed are not readily comparable to engaging in a continuing criminal enterprise. *See, e.g.,* 18 U.S.C. § 351(b)(1) (kidnapping government official punishable by life or term of years); 18 U.S.C. § 794 (delivering defense information to injury of United States or advantage of foreign nation punishable by death, life or term of years); 18 U.S.C. § 1201(a) (kidnapping punishable by life or term of years); 18 U.S.C. § 1651 (piracy punishable by life); 42 U.S.C. § 2272 (atomic energy offenses intended to injure United States or secure advantage for foreign nation punishable by life or term of years); 49 U.S.C. § 1472(i)(1)(B) (aircraft piracy resulting in death punishable by death or life).

669 F.2d 185 (4th Cir.1982); *Valenzuela, supra* (defendant sentenced to life imprisonment under section 848); *United States v. Sperling,* 560 F.2d 1050 (2d Cir.1977) (defendant sentenced to life imprisonment under section 848); *United States v. Jeffers,* 532 F.2d 1101 (7th Cir.1976) (defendant sentenced to life imprisonment under section 848), *rev'd on other grounds,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977).[16] To be sure, these cases are not factually identical to the instant case. And there may have been some more serious violations of section 848 which have been less severely punished. Our review of the cases, however, indicates that the sentences imposed on appellants are not so out of line with those imposed on other offenders as to constitute cruel and unusual punishment.[17]

The last factor mentioned in *Solem* relates to "the sentences imposed for commission of the same crime in other jurisdictions." 103 S.Ct. at 3011.[18] Due to the unique nature of section 848, consideration of this factor is difficult, if not impossible. In short, given the key role played by the continuing criminal enterprise provision in the federal drug enforcement scheme and the unparalleled comprehensiveness of that scheme, it is doubtful that "the same crime" exists in "other jurisdictions." In any event, our examination of comparable state-law offenses reveals no serious disparity indicating that appellants' sentences are excessive. *See, e.g.,* Fla.Stat.Ann. § 775.084(4)(a) (1976) (habitual felony offender punishable by 10 years' to life imprisonment); Fla.Stat.Ann. § 893.13(1)(b) (Supp.1984) (possession or sale of over 10 grams of narcotics punishable by up to 30 years' imprisonment); Fla.Stat.Ann. § 893.-

13(1)(c)(1) (Supp.1984) (delivery of narcotics to minor punishable by up to 30 years' imprisonment); Fla.Stat.Ann. § 895.04 (Supp.1984) (RICO violation punishable by up to 30 years' imprisonment).

On the basis of the foregoing analysis, we hold that appellants' sentences under section 848 are not so grossly disproportionate to their crime as to violate the eighth amendment.

### B. *"Stand Committed" Fines*

■ At the time of sentencing, Constantine Yamanis was fined a total of $130,000 and was ordered "to stand committed until the fine is paid or until the defendant is otherwise discharged by due course of law." Noting that even if paroled, he would remain incarcerated pending payment of his fines, Yamanis now contends that because of his indigency, the imposition of "stand committed" fines will result in the denial of due process and equal protection. He relies entirely on the district court's appointing trial counsel as evidence of his indigency.

We dismiss this claim out of hand. Yamanis' representations at the hearing regarding the appointment of counsel on May 10, 1982, and in his financial affidavit of the same date reveal that he owned assets in excess of $450,000. He sought the appointment of counsel not because he was poor, but because his money was not readily available. At the May 10th hearing and in its order the next day, the district court made it clear that it doubted Yamanis' indigency even for appointment of counsel purposes [19] and that it acted strictly out of "an abundance of caution." As there has been

---

**16.** There is also a host of cases involving shorter, though substantial, prison terms which, given the age of the defendants and other circumstances, may be effectively as severe as the prison terms in this case. *See supra,* note 10.

**17.** Michael Yamanis stresses that the length of his sentence is over twice the national average and over six years greater than the average for the Northern District of Florida. Since the use of such statistics could entail no consideration of relative gravity, our reliance on them would

be misplaced. At any rate, to the extent that they are relevant, these averages—particularly the figure for the Northern District of Florida—hardly support appellant's claim.

**18.** *See supra,* note 14.

**19.** At the hearing, the court stated, "The affidavit of the defendant Constantine Yamanis is marginal, at best, concerning his ability to hire counsel."

no suggestion that Yamanis' assets had dwindled or that these assets would be unavailable if he were paroled, we find no merit in his claim.

## C. *Cumulative Fines*

■ Appellants were fined $100,000 on Count I and $15,000 on each of Counts IV and V. These fines were cumulative such that they totalled $130,000. Citing *Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977) and *United States v. Chagra*, 669 F.2d 241 (5th Cir.), *cert. denied*, 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982), appellants maintain that a fine for engaging in a continuing criminal enterprise cannot be made cumulative with fines for predicate offenses.

This issue is directly controlled by the recent decision in *United States v. Brantley*, 733 F.2d 1429 (11th Cir.1984). There the defendant argued that he could not be cumulatively punished for a section 848 violation and an underlying section 841 violation. Referring to *United States v. Garrett*, 727 F.2d 1003 (11th Cir.1984), and *United States v. Phillips*, 664 F.2d 971 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982), the *Brantley* court declared:

> Those cases hold essentially that the § 841 offense and the § 848 offense are distinct for double jeopardy purposes. *See Garrett*, 727 F.2d at 1009; *Phillips*, 664 F.2d at 1009. In light of the "basic design [of double jeopardy] as a bar against repeated attempts to convict," *United States v. DiFrancesco*, 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980), if successive prosecutions (involving of course cumulative punishment) are not barred, it follows logically that double jeopardy does not bar cumulative punishment in a single prosecution for § 841 predicate offenses and the § 848 offense.

733 F.2d at 1437 (footnote omitted). On the authority of *Brantley*, we hold that the district court did not err in imposing cumulative fines.

## V. MICHAEL YAMANIS: PERSONAL JURISDICTION

Michael Yamanis contends that under existing standards of due process, the district court was divested of jurisdiction over his person due to the illegality of the manner in which he was brought before the court. In support of his claim, he alleges that an American agent, with the assistance of Honduran officials, arrested him in San Pedro-Sula, Honduras, drove him at gunpoint to Tegucigalpa, and put him against his will on a plane bound for Miami via Belize, all under the guise of a Honduran deportation. He further alleges that when he attempted to deplane in Belize, asserting his rights as a British subject, he was wrestled back into his seat and forced to remain there until his arrival in Miami. Yamanis argues that the alleged kidnapping was unlawful, particularly in that it circumvented the judicially supervised extradition procedures specified by treaty and by statute. According to Yamanis, we should vacate his conviction and have his indictment dismissed with prejudice.

■ This case falls squarely within the *Ker-Frisbie* doctrine, which holds that a defendant cannot defeat personal jurisdiction by asserting the illegality of the procurement of his presence. This doctrine takes its name from two cases in which the Supreme Court rejected the due process claims of defendants who had been brought by force into the jurisdictions in which they were tried. *See Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886); *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952). This circuit's adherence to the *Ker-Frisbie* doctrine was unequivocally established in *United States v. Winter*, 509 F.2d 975 (5th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975), in which the former Fifth Circuit declared:

> [W]e are convinced that under well established case law of the Supreme Court and this Circuit, a defendant in a federal criminal trial whether citizen or alien, whether arrested within or beyond the territory of the United States may not

successfully challenge the District Court's jurisdiction over his person on the grounds that his presence before the Court was unlawfully secured.

*Id.* at 985–86; *see also United States v. Postal,* 589 F.2d 862, 873 (5th Cir.) ("A defendant may not ordinarily assert the illegality of his obtention to defeat the court's jurisdiction over him"), *cert. denied,* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979).

▆ Yamanis' claim is remarkably similar to the one rejected in *United States v. Herrera,* 504 F.2d 859 (5th Cir.1974). There the defendant, a non-resident alien, alleged that two American agents, together with two Peruvian agents, had unlawfully arrested him in Peru and forcibly transported him to Florida. Not unlike the present case,

> [t]he argument is that he was kidnapped and forcibly abducted in contravention of federal statutes, and in a manner which violated the territorial integrity of Peru .... He also urges a loss of jurisdiction by reason of the failure of the United States to follow the orderly processes of extradition under the treaty between the United States and Peru.

*Id.* at 860. Applying the *Ker-Frisbie* doctrine, the court concluded, "It is settled by both Supreme Court decisions and decisions of this court that these contentions are without merit." *Id.* Likewise, we hold that Yamanis' claim that the district court lacked personal jurisdiction is meritless.

Yamanis urges us to reverse on the authority of the Second Circuit's decision in *United States v. Toscanino,* 500 F.2d 267 (2d Cir.1974). We decline to do so for three reasons. First, the Second Circuit itself has limited *Toscanino* to situations of ex-

treme misconduct. *See Lujan v. Gengler,* 510 F.2d 62 (2d Cir.), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975). Since Yamanis has not alleged the sort of "cruel, inhuman and outrageous treatment allegedly suffered by Toscanino," *id.* at 65,[20] relief would not be warranted if we were to follow the Second Circuit. Second, although this court has not ruled out the possibility of a narrow exception to the *Ker-Frisbie* doctrine for extreme cases, it has plainly rejected the broad reading of *Toscanino* which Yamanis urges us to adopt. *See Postal,* 589 F.2d 874 n. 17; *Winter,* 509 F.2d at 986–88; *Herrera,* 504 F.2d at 860. Third, the continuing validity of the *Toscanino* approach is questionable after the intervening decision in *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), in which the Supreme Court refused to "retreat from the established rule that illegal arrest or detention does not void a subsequent conviction." *Id.* at 119, 95 S.Ct. at 865.[21]

## VI. MICHAEL YAMANIS: INACCURATE PRESENTENCE REPORT

Before sentencing Michael Yamanis, the district court afforded him an opportunity to point out "anything in the presentence investigation that is inaccurate, incomplete or not true." Counsel informed the court that Yamanis disputed the accuracy of two factual assertions in the presentence report, one referring to the amount of marijuana handled by the Yamanis organization and the other referring to Yamanis' ownership of that marijuana. The court remarked:

> Well, as I recall the testimony there was ample evidence that Mr. Yamanis and his brother, Constantine, were quite capable of smuggling and had brought in many,

---

**20.** In *Toscanino,* the defendant had been subjected to brutal torture and incessant interrogation for some 17 days.

While we do not condone any form of mistreatment of a defendant, we find that Yamanis' allegations, even if true, do not constitute "shocking governmental conduct sufficient to convert an abduction which is simply illegal into one that sinks to a violation of due process." *Lujan,* 510 F.2d at 66.

**21.** In the alternative, Yamanis asks that we remand for an evidentiary hearing on the circumstances of his arrest. To the extent that we have taken his allegations as true in ruling against him, we see no point in remanding for factual development. *See also Herrera,* 504 F.2d at 860 n. 1 (dismissing unsupported factual allegations "which read on the claims made by Toscanino").

many, many tons before the house of cards began to fall in Marianna. And so to the extent that your recollection and my recollection differ, I guess the record will show exactly the number of tons or pounds that Mr. Yamanis and his brother and several hundred others probably involved in the organization brought in from time to time.

On appeal, Yamanis again contests the accuracy of the report and argues that the case must be remanded for resentencing. His claim may be broken down into two parts: first, that the district court erred in failing to resolve the factual dispute on the record, and second, that the district court's reliance on false information in sentencing resulted in the denial of due process.

■■■ In *United States v. Stephens*, 699 F.2d 534 (11th Cir.1983), the defendant similarly disputed the accuracy of the presentence report and argued that the district court should have made factual findings related to the disputed facts and corrected the report accordingly. Noting that the defendant had been "given the opportunity to refute the perceived discrepancies in the presentence report," *id.* at 537, the court held that a sentencing judge is not "required to go further and make findings to resolve the possible conflicting versions presented ...," *id.* The court explained, "Having been presented with some contradictory facts, the district court may, within its discretion, determine that it has adequate undisputed information to properly sentence the defendant." *Id. Stephens* confirms that the first part of the Yamanis' claim is without merit.

■■■ There are several problems with the second part of the claim, regarding the district court's asserted reliance on false information. It is well settled that sentences based on erroneous and material information or assumptions violate due process and that a new sentencing hearing is

required where the trial court has relied on such information or assumptions. *See United States v. Tobias*, 662 F.2d 381, 388 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982), and cases cited. In this case, however, it is by no means clear that the information in the presentence report was materially erroneous. At the sentencing hearing, Yamanis offered no additional evidence to refute the factual assertions in question; instead, he suggested that these assertions were inconsistent with the evidence adduced at trial. Our review of the record finds support for the proposition that at least with respect to some of the marijuana, Yamanis' role was that of owner as well as transporter. As for the total amount of marijuana involved, the record does not confirm the inaccuracy of the government's estimate. Yamanis has therefore failed to demonstrate a major premise of his argument, the misstatement of material facts.

In addition, the record in this case simply does not establish that the district court actually relied on the contested assertions in the report. Although, as Yamanis points out, the court inevitably took into account the quantity of drugs involved and Yamanis' role in the continuing criminal enterprise, it does not follow that the court based its decision on the version of these facts in the presentence report. In view of his having heard the evidence when presiding over the trial and his having had the purported inaccuracies in the report brought to his attention, we decline to presume that the sentencing judge nevertheless relied on the disputed statements.

Yamanis responds that the district court's failure to state that the contested assertions would not influence its sentencing determination constitutes grounds for remanding.[22] According to Yamanis, the

---

22. Rule 32(c) of the Federal Rules of Criminal Procedure now provides in part:

 If the comments of the defendant and his counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or

the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing.

mere possibility of the courts having taken into account the contested assertions renders the sentence unconstitutional. We need not decide whether a substantial possibility of reliance on inaccurate information would render a sentence unconstitutional,[23] for we conclude that any possibility of reliance in this case is too remote to rise to the level of a due process violation. In our opinion, the comments of the district judge at sentencing tend to rule out the possibility of reliance. Referring to the amount of marijuana in particular, the court indicated that it would rely on its own recollection of the facts, and ultimately on the record, rather than on the corresponding statements in the presentence report. The court's remarks also suggest that it was concerned with Yamanis' having "brought in" marijuana, rather than his having owned it. We emphasize again that the judge had had the benefit of hearing all the evidence at trial and thus was not dependent on the presentence report as a source of information,[24] and that his attention had been drawn to the purported inaccuracies such that he was unlikely to rely on the report without first resolving, albeit

tacitly, the factual dispute.[25] Although the district court did not unequivocally repudiate the contested portions of the presentence report, we think it highly improbable that it relied on them.[26] Thus we uphold Yamanis' sentence.

## VII. CALISE: DANGEROUS SPECIAL DRUG OFFENDER

Calise challenges the sentence he received as a dangerous special drug offender under 21 U.S.C. § 849 on four grounds: (a) that the government failed to give timely notice, as required by the statute; (b) that the government failed to give adequate notice, as required by the statute; (c) that application of the preponderance standard of proof, together with admission of similar act evidence and hearsay evidence, violated the due process clause; and (d) that the government sought sentence enhancement out of vindictiveness, in violation of the due process clause. We address and reject each ground in turn.

### A. Timeliness of Notice

Under § 849(a), in order for a defendant to be sentenced as a dangerous special

Fed.R.Crim.P. 32(c)(3)(D). This provision, however, was not effective until August 1, 1983. At the time of Yamanis' sentencing, Rule 32 required only that the court "afford the defendant or his counsel an opportunity to comment thereon and, at the discretion of the court, to introduce testimony or other information relating to any alleged factual inaccuracy contained in the presentence report." Fed.R.Crim.P. 32(c)(3)(A). While recognizing Rule 32(c)(3)(D) as a salutory measure, we note that it does not purport to state the requirements of due process. We also note that in this case the district court fully complied with the rule then in force.

23. *Compare United States v. Espinoza*, 481 F.2d 553, 556 (5th Cir.1973) (due process requires that defendant be afforded opportunity to rebut representations in presentence report only "where a sentencing judge *explicitly relies* on [that] information in assessing a sentence"), *with United States v. Robin*, 545 F.2d 775, 779 (2d Cir.1976) ("Where there is a possibility that sentence was imposed on the basis of false information or false assumptions concerning the defendant, an appeal will lie to this Court and the sentence will be vacated").

24. In this regard, the present case is distinguishable from *United States v. Robin*, 545 F.2d 775 (2d Cir.1976), in which the defendant had entered a guilty plea. The *Robin* court observed, "Without the benefit of a trial, the sentencing judge necessarily leaned heavily on the presentence report ... as [a source] of information concerning the appellant's behavior and alleged criminal acts." *Id.* at 781.

25. Hence this case differs from *McGee v. United States*, 462 F.2d 243 (2d Cir.1972), for there the invalid premise on which the sentence was possibly based was a conviction subsequently vacated on appeal.

26. Our disposition of this claim is not inconsistent with *United States v. Battaglia*, 478 F.2d 854 (5th Cir.1972), and *United States v. Vasquez*, 638 F.2d 507 (2d Cir.1980), *cert. denied*, 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981), in which the courts of appeal remanded for resentencing in the face of possibly erroneous information or assumptions. In *Battaglia*, the sentencing judge explicitly "stated that he was taking into consideration certain facts which he believed to be true," 478 F.2d at 854, but which the defendant later claimed were false. And in *Vasquez*, the sentencing judge plainly indicated his reliance on the assumptions in question.

drug offender, the government "a reasonable time before trial" must "file with the court" a notice regarding the defendant's status as a dangerous special drug offender. 21 U.S.C.A. § 849(a) (1981). In this case, the government filed its notice on May 28, 1982. Jury selection took place on June 1, and the trial was recessed until June 8.

■ Emphasizing that the notice was filed on the last working day before jury selection and was unlikely to reach him until after jury selection, Calise argues that the government failed to comply with the statutory requirement of notice "a reasonable time before trial." Addressing the identical contention in its order of December 30, 1982, the district court concluded, "While the Government's conduct in this case cannot be commended, it satisfied the express requirement of the statute." The court explained that it would have been more inclined to find the government's delay unreasonable had Calise demonstrated some prejudicial effect. In this regard, the court noted that Calise had been advised of the government's intent to prosecute under section 849 during plea negotiations and thus had received actual notice well in advance of trial. The court also noted that because he had been charged with the two counts of conspiracy, as well as the substantive counts arising from the DC–6 episode, Calise already had an interest in disproving his alleged participation in the other drug episodes. We are persuaded by the district court's reasoning and similarly hold that the government's notice in this case was filed in a timely fashion.

■ We agree with Calise that "strict compliance by the Government with the statutory filing requirement is a prerequisite for an enhanced sentence," *United States v. Noland*, 495 F.2d 529, 530 (5th Cir.), *cert. denied*, 419 U.S. 966, 95 S.Ct.

228, 42 L.Ed.2d 181 (1974), and that a showing of prejudice is not independently required in order to set aside a sentence on the ground of noncompliance. Where the government has filed a notice prior to trial, however, we consider the presence or absence of prejudice in determining whether the interval between filing and trial was "reasonable." For instance, even though actual knowledge is no substitute for the requisite filing, to the extent that it reduces prejudice, it suggests that the interval between filing and trial was not unreasonable.

As the court below observed, the prejudice attributable to the government's failure to file earlier was minimal in this case. Calise asserts that despite his actual notice of the government's intent to seek sentence enhancement and the incentives provided by the conspiracy charges, the government's delay hindered his ability to plea-bargain intelligently and to put on a defense at trial inasmuch as he remained ignorant of the precise circumstances on which the government was to rely in demonstrating his dangerous special drug offender status. While raising a theoretical possibility of prejudice, Calise does not indicate how he would have acted differently if the notice had been filed earlier. Under the circumstances, we conclude that the three days between filing and jury selection and the ten days between filing and testimony constituted "a reasonable time before trial." [27]

### B. *Adequacy of Notice*

Section 849(a) requires that the notice set out "with particularity the reasons why [the U.S.] attorney believes the defendant to be a dangerous special drug offender." 21 U.S.C.A. § 849(a)(2) (1981). In its notice, the government specified that Calise

---

**27.** The main source of difficulty identified by Calise is counsel's not having actually received the government's notice until long after trial. According to the certificate of service, a copy of the notice was mailed to counsel on the date it was filed. Evidently, the copy was lost in transit, and as a result of confusion in the district court's clerk office, counsel did not become aware of the contents of the notice until July 12. While this was certainly a serious turn of events, any prejudice therefrom is hardly attributable to the government's timing and hence has no bearing on the timeliness of the notice.

was a "special drug offender," as defined in subsections 849(e)(2) and (3), and "dangerous" as defined in section 849(f). In support, the government incorporated by reference the indictment and the bill of particulars, noting that they contained "detailed allegations regarding the defendant's misconduct," and listed five points as a summary of the allegations. Calise now asserts that the reasons given by the government for believing him to be a dangerous special drug offender were insufficiently particularized to satisfy the statute.

■ At the outset, Calise contends that the notice was inadequate in that it is impossible to ascertain whether the various allegations relate to his special drug offender status or his dangerousness, or both. Insofar as dangerousness may be inferred from the circumstances establishing special drug offender status, *cf. United States v. Ilacqua,* 562 F.2d 399, 403 (6th Cir.1977) (applying 18 U.S.C. § 3575), *cert. denied,* 435 U.S. 906, 98 S.Ct. 1453, 55 L.Ed.2d 497 (1978), it is certainly reasonable for the government to use the same allegations to establish that a defendant is both a special drug offender and dangerous. Assuming in the absence of any contrary indication that the government assessed independently whether Calise met the two criteria, we conclude that its failure to designate which allegations were made in support of each did not render the notice inadequate.

■ Next Calise argues that the government's allegations were insufficient to establish his status as a special drug offender under subsections 849(e)(2) and (3). Because the government withdrew its assertion that Calise was a special drug offender under subsection (2) at sentencing

and the district court found him to be a special drug offender under subsection (3), we need only address the sufficiency of the allegations with respect to the latter. Subsection (3) contains two elements: first, that the defendant was involved in "a conspiracy with three or more other persons to engage in a pattern of dealing in controlled substances ...," 21 U.S.C. § 849(e)(3), and second, that the defendant "did, or agreed that he would, initiate, organize, plan, finance, direct, manage, or supervise all or part of such conspiracy or dealing, or give or receive a bribe or use force in connection with such dealing," *id.* There were ample allegations relating to both elements.

The indictment itself charged Calise with conspiring with eight others to possess with intent to distribute (Count II) and to import (Count III) marijuana. In addition, the government's notice alleged that he had conspired with several others to import and distribute multi-ton quantities of marijuana and hashish. These general allegations were supplemented by the bill of particulars, in which the government specifically listed the major drug incidents constituting the core of the conspiracies charged.[28] Calise's involvement in a conspiracy to engage in a pattern of dealing in controlled substances was therefore established with the requisite particularity. With reference to the second element, the government's notice stated generally that "Defendant was an organizer, manager, and superviser in this criminal organization, directing the illegal activities of others." Again the bill of particulars provided the specifics, listing numerous episodes in which Calise played a supervisory role. Thus the nature of Calise's participation

---

28. Calise has argued throughout that except for the first paragraph (which relates to the *Kyoto* episode and in which Calise is named) and the third paragraph (which relates to the DC–6 episode), the bill of particulars relates only to the continuing criminal enterprise charged in Count I. We find no basis for this assumption. Calise's assertion to the contrary notwithstanding, the comments of the court and the prosecutor at trial indicating that the bill of particulars relates to the continuing criminal enterprise do not lead to the conclusion that it relates only to the continuing criminal enterprise. Indeed, the bill itself states only that "[t]he government's case will focus on but not be limited to the following incidents," in no way implying that it relates to Count I. At any rate, we think it clear beyond peradventure that in including the bill of particulars in its notice under section 849, the government intended it to serve as an enumeration of the incidents relating specifically to Calise's status as a dangerous special drug offender.

was also established with the requisite particularity.

Finally, Calise maintains that the government failed to allege his dangerousness under section 849(f) with sufficient particularity. We disagree. Section 849(f) defines "dangerous" in terms of whether "a period of confinement longer than that provided for such felonious violation is required for the protection of the public from further criminal conduct by the defendant." 21 U.S.C.A. § 849(f) (1981). The government's notice alleges, "Numerous shiploads and planeloads of marijuana and hashish were successfully imported into the United States and distributed by defendant and his co-conspirators." As mentioned above, the bill of particulars goes on to list a series of large-scale drug transactions in which Calise was involved. Moreover, the notice points out his special skills, including: "(a) the ability to organize and plan criminal activities; (b) management and supervisory expertise; (c) knowledge of the illegal marijuana market; (d) the knowledge of how and where to obtain the services of other criminals to assist in this criminal conspiracy." In our opinion, the notice constitutes a sufficiently specific statement of reasons for believing, as the district court ultimately concluded, that Calise had long been "a professional drug trafficker" and was therefore dangerous within the meaning of the statute.

C. *Standard of Proof*

Section 849(b) provides, "If it appears by a preponderance of the information ... that the defendant is a dangerous special drug offender, the court shall sentence the defendant to imprisonment for an appropriate term ...." 21 U.S.C.A. § 849(b) (1981). Calise contends that this provision is constitutionally infirm because it authorizes findings of fact based on proof by a preponderance of the evidence rather than proof beyond a reasonable doubt. His contention is premised on the assertion that sentence enhancement under section 849, particularly when the government relies on the definitions of "special drug offender" in subsections 849(a)(2) and (3), is in effect prosecution on new criminal charges. As such, he argues, it is subject to the Supreme Court's holding in *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.* at 364, 90 S.Ct. at 1073.

While there is a dearth of decisions on the constitutionality of section 849, several cases address the standard of proof question in connection with 18 U.S.C. § 3575, the sentence enhancement statute governing non-drug cases. As section 849 was modeled on and is virtually identical to section 3575—the two statutes employ the "preponderance of the information" standard and similar definitions of "special offender" and "dangerous"—we find these cases most persuasive, if not controlling. We know of only one decision sustaining a claim similar to Calise's, *United States v. Duardi*, 384 F.Supp. 874, 882–85 (W.D.Mo. 1974), *aff'd on other grounds*, 529 F.2d 123 (8th Cir.1975). Indeed, the courts of appeal have uniformly held that use of the preponderance standard in sentence enhancement proceedings comports with the due process clause. *See United States v. Davis*, 710 F.2d 104 (3d Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 505, 78 L.Ed.2d 695 (1983); *United States v. Schell*, 692 F.2d 672, 676–79 (10th Cir.1982); *United States v. Inendino*, 604 F.2d 458, 463 (7th Cir.1979) (affirming 463 F.Supp. 252 (N.D.Ill.1978)), *cert. denied*, 444 U.S. 932, 100 S.Ct. 276, 62 L.Ed.2d 190 (1979); *United States v. Williamson*, 567 F.2d 610, 615 (4th Cir.1977); *United States v. Bowdach*, 561 F.2d 1160, 1172–75 (5th Cir.1977); *United States v. Ilacqua*, 562 F.2d 399, 405 (6th Cir.1977), *cert. denied*, 435 U.S. 906, 98 S.Ct. 1453, 55 L.Ed.2d 497 (1978); *United States v. Neary*, 552 F.2d 1184, 1193–94 (7th Cir.), *cert. denied*, 434 U.S. 864, 98 S.Ct. 197, 54 L.Ed.2d 139 (1977); *United States v. Stewart*, 531 F.2d 326, 332–34 (6th Cir.), *cert. denied*, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 376 (1976). Compelled not only by

the overwhelming weight of these authorities, but also by the force of their reasoning, we conclude that the use of the preponderance standard in imposing sentence under section 849 is likewise constitutional.

While ordinary sentencing proceedings are by no means immune from all due process attacks, the Supreme Court has required only minimal due process protections in such proceedings. *See United States v. Grayson,* 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978); *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). In *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), however, the Court required additional procedural safeguards where the defendant had received a longer prison term pursuant to a statute requiring additional fact-finding by the sentencing judge. Having been convicted of a sex-related offense under one Colorado statute, the defendant in *Specht* was sentenced to an additional term of imprisonment under the Colorado Sex Offenders Act. Under that statute, the judge could enhance sentence without notice or a hearing based entirely on a psychiatric report, after making findings of fact regarding dangerousness, habitual offender status and mental illness. Holding the statute unconstitutional, the Court declared:

> Due process ... requires that [the defendant] be present with counsel, have an opportunity to be heard, be confronted with witnesses against him, have the right to cross-examine, and to offer evidence of his own. And there must be findings adequate to make meaningful any appeal that is allowed.

*Id.* at 610, 87 S.Ct. at 1212.

Although the courts differ on the similarity between sentencing proceedings under the dangerous special offender statute and the sentencing proceeding in *Specht, compare Davis,* 710 F.2d at 106; *Schell,* 692 F.2d at 676–78; *Bowdach,* 561 F.2d at 1172–75, *with Stewart,* 531 F.2d at 332 & n. 2, they universally agree the federal statute fulfills the due process requirements articulated in *Specht, see Davis,* 710

F.2d at 106–07; *Schell,* 692 F.2d at 677; *Bowdach,* 561 F.2d at 1174; *Stewart,* 531 F.2d at 332. Insofar as it guarantees to a defendant the right to notice and a hearing, to assistance of counsel, to compulsory process, to cross-examination, to findings of fact and to appeal, *see* 21 U.S.C.A. § 849(b) (1981), the dangerous special drug offender statute also affords every procedural protection expressly required by *Specht.*

 *Specht* does not hold, as Calise suggests, that due process requires all findings made by a sentencing judge to be based on proof beyond a reasonable doubt. *See Davis,* 710 F.2d at 107 & n. 1; *Schell,* 692 F.2d at 677–78; *Bowdach,* 561 F.2d at 1172–74; *Hollis v. Smith,* 571 F.2d 685, 689–90 (2d Cir.1978). To determine whether due process mandates that standard of proof, we must balance the defendant's liberty interests, the risk of erroneous deprivation and the government's interest in protecting society. *See Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Having balanced these interests, we agree with our sister circuits that the preponderance standard passes constitutional muster. *See Davis,* 710 F.2d at 107; *Schell,* 692 F.2d at 678.

Calise maintains that the cases upholding section 3575 are distinguishable in that they deal exclusively with subsection 3575(e)(1), which corresponds with subsection 849(e)(1), whereas the instant case involves subsections 849(e)(2) and (3), which correspond with subsections 3575(e)(2) and (3). Unlike subsection (1), under which sentence enhancement is based on prior convictions, he argues, subsections (2) and (3) essentially entail distinct criminal charges against the defendant. Since we can accept neither his characterization of the cases upholding section 3575 nor his characterization of subsections (2) and (3), we find the distinction urged by Calise insignificant.

We note initially that several of the cases cited above deal with section 3575(f), which defines "dangerous," as well as subsection

3575(e)(1). Thus to the extent that their treatment of the preponderance standard in connection with the determination of dangerousness would also apply to the determination of special drug offender status under subsections 849(e)(2) and (3), these cases would not be inapposite even if subsections (2) and (3) were significantly different from subsection (1).

More important, we reject Calise's assertion that subsections (2) and (3) encompass new criminal charges. To the contrary, these subsections, like subsection (1), merely introduce circumstances in aggravation of the offense for which the conviction was obtained. Under subsection (2), a "pattern of dealing in controlled substances" is relevant only if it relates to the underlying felonious violation. Similarly, a "conspiracy ... to engage in a pattern of dealing in controlled substances" under subsection (3) must relate to the underlying felony. In either case, the facts to be established bear on the seriousness of the crime of which the defendant has been convicted. In this regard, the words of the Sixth Circuit in *Stewart*, referring to section 3575, are apt:

> It is to be emphasized that ... the statute here involved does not create a new and distinct criminal charge. Rather, the dangerous special offender criteria provide for an increase in the penalty for the offense itself. Under [the statute], the conduct embraced within the criteria must be factually related to the felony for which sentence is imposed.... [The statute] involves, in *Specht*'s language, [a] "distinct issue," but it does not constitute a separate charge.

531 F.2d at 332 (citation and footnote omitted); *see also Inendino*, 604 F.2d at 463 ("This section [3575], however, does not create a separate criminal charge but instead provides for the enhancement of the penalty for the defendant's criminal conviction."); *Williamson*, 567 F.2d at 614, 615 (quoting *Stewart*, 531 F.2d at 332); *Ilacqua*, 562 F.2d at 405 ("we reemphasize that the enhancement statute [section 3575] is not a separate criminal charge"). We con-

clude that subsections 849(e)(2) and (3), if properly applied, do not introduce new and distinct criminal charges thereby necessitating proof beyond a reasonable doubt. Because subsection 849(e)(3) and section 849(f) were properly applied in this case, we hold that the imposition of an additional sentence on the basis of proof "by a preponderance of the information" did not violate Calise's due process rights.

Finally, we are unpersuaded by Calise's objections to the admission of similar act evidence and hearsay evidence at the sentencing hearing. The similar acts in question were the drug episodes listed in the bill of particulars. As these episodes related to the alleged "conspiracy ... to engage in a pattern of dealing in controlled substances" under subsection 849(e)(3), they were by no means extrinsic to the sentencing proceeding. With reference to the purported hearsay testimony, we note that under section 850, "no limitation shall be placed on the information concerning the background, character, and conduct of the person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence ...." 21 U.S.C.A. § 850 (1980). As the *Inendino* court concluded:

> The argument that the district court erred in admitting hearsay testimony in the sentencing hearing is without merit. In considering a sentence the trial judge may conduct a broad inquiry which is "largely unlimited either as to the kind of information he may consider, or the source from which it may come." The sentencing court under the dangerous special offender statute retains the same broad discretion as in the usual sentencing procedure.

604 F.2d at 463–64 (citations omitted) (quoting *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972)); *see also Williamson*, 567 F.2d at 615 ("the sentencing court may, in its broad discretion, consider all information which has a bearing upon proof of the defendant's dangerousness. The formal

rules of evidence used in criminal trials do not limit the sources of information which a court may consider in determining what is a proper sentence for a dangerous special offender").

### D. *Prosecutorial Vindictiveness*

■ During plea negotiations, the government expressed its intent to seek sentence enhancement under section 849 and offered to forego prosecution as a dangerous special drug offender if Calise would plead guilty as charged. Calise rejected this offer and was ultimately sentenced under section 849. He now asserts that the government filed for sentence enhancement in a vindictive effort to penalize his exercising his right to trial by jury. As a result, he argues, he was denied due process.

The Supreme Court dealt with this precise issue in *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). There the defendant was initially charged with uttering a forged instrument. During plea negotiations, the prosecutor informed the defendant that if he did not plead guilty, the state would seek an indictment under the applicable habitual offender statute, thereby exposing him to a possible life sentence. The defendant chose not to plead guilty, the prosecutor carried out his threat, and the defendant was convicted and sentenced as a habitual offender.

In rejecting the defendant's due process claim, the Court stated:

> While the prosecutor did not actually obtain the recidivist indictment until after the plea conferences had ended, his intention to do so was clearly expressed at the outset of the plea negotiations. Hayes was fully informed of the true terms of the offer when he made his decision to plead not guilty. This is not a situation, therefore, where the prosecutor without

notice brought an additional and more serious charge after plea negotiations relating only to the original indictment had ended with the defendant's insistence on pleading not guilty.

*Id.* at 360–61, 98 S.Ct. at 666 (footnote omitted). The Court reasoned:

> While confronting a defendant with the risk of more severe punishment clearly may have a "discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable"—and permissible—"attribute of any legitimate system which tolerates and encourages the negotiation of pleas." *Chaffin v. Stynchcombe, supra,* 412 U.S. [17] at 31, 93 S.Ct. [1953] at 1985 [36 L.Ed.2d 714 (1973)]. It follows that, by tolerating and encouraging the negotiation of pleas, this Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forego his right to plead not guilty.

*Id.* at 364, 98 S.Ct. at 668. The Court concluded, "the course of conduct engaged in by the prosecutor in this case, which no more than openly presented the defendant with the unpleasant alternatives of foregoing trial or facing charges on which he was plainly subject to prosecution, did not violate the Due Process Clause of the Fourteenth Amendment." *Id.* at 365, 98 S.Ct. at 669; *see also United States v. Pleasant,* 730 F.2d 657, 665 (11th Cir.1984) (applying *Bordenkircher* in section 3575 case).

In our opinion, the present case is indistinguishable from *Bordenkircher.* Calise was fully informed of the terms of the plea offer[29] and simply declined to accept. Accordingly, we find no support for his claim of prosecutorial vindictiveness.

---

**29.** Calise argues that he was not fully informed in that he was unaware of the precise circumstances on which the government would rely in seeking sentence enhancement. The precise circumstances, however, were not terms of the offer; rather, the government's promise not to seek sentence enhancement was the crucial

term. Under *Bordenkircher,* regardless of the precise circumstances relied on, the government's communicating its intent to seek sentence enhancement in the event of trial confirms that it was not motivated by vindictiveness in subsequently doing so.

## VIII. CALISE: JUROR INTERVIEWS

According to the affidavit of codefendant Harris, shortly after the verdicts were returned on June 15, 1982, Harris approached one of the jurors, who informed him that she opposed the convictions, but had been told that majority rule controlled. Counsel for Harris filed, and Calise subsequently adopted, a notice of intention to interview jurors along with Harris' affidavit. The government moved to prevent the interviewing and to strike the affidavit. In its order of June 23, 1982, the district court barred the defendants and their counsel from conducting interviews with the jurors who decided the case. On appeal, Calise asserts that Harris' affidavit raises the possibility that extraneous prejudicial information was brought to the jury's attention, that an outside influence was brought to bear on the jury, or that one of the jurors was biased against the defendants. Thus, he contends, the district court erred in disallowing juror interviews. We disagree.

 Where there are allegations of extraneous information, outside influence or other jury misconduct, the decision whether to investigate rests in the sound discretion of the district court. *See United States v. Barshov,* 733 F.2d 842, 850 (11th Cir.1984); *United States v. Lopez,* 728 F.2d 1359, 1363 (11th Cir.1984); *United States v. Williams,* 716 F.2d 864, 865 (11th Cir.1983); *United States v. Edwards,* 696 F.2d 1277, 1282 (11th Cir.), *cert. denied,* — U.S. —, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1983). In *Edwards,* the court observed:

> [T]his court has not imposed a stringent duty of investigation upon a district judge under comparable circumstances. *Grooms v. Wainwright,* 610 F.2d 344 (5th Cir.), *cert. denied,* 445 U.S. 953, 100 S.Ct. 1605, 63 L.Ed.2d 789 (1980). Instead, "[t]he judge's decision whether to interrogate the jury about juror misconduct is within his sound discretion, especially when the alleged prejudice results from statements made by the jurors themselves, and not media publicity or other outside influences." *Id.* at 347.

696 F.2d at 1282. Even when the alleged misconduct involved outside influences, investigation is not automatically required. As the *Barshov* court noted:

> Where a colorable showing of extrinsic influence is made, a trial court, in the exercise of its discretion, must make sufficient inquiries or conduct a hearing to determine whether the influence was prejudicial. However, there is no *per se* rule requiring an inquiry in every instance. The duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality. In other words, there must be something more than mere speculation.

733 F.2d at 851 (citations omitted).

 Calise failed to make even a "colorable showing" of extraneous information, outside influence or other jury misconduct. Indeed, Harris' affidavit contains not the slightest hint that the jury was exposed to media publicity, contact with others, or a similar source of information or pressure. And although it is conceivable that one of the jurors was biased, to infer such bias from the conversation recounted in the affidavit would be nothing "more than mere speculation." Insofar as the affidavit on which Calise relies suggests confusion, rather than impropriety, on the part of one or more jurors, we hold that the district court acted well within the scope of its discretion in prohibiting juror interviews.

In so holding, we concur with the sentiments expressed by the Fourth Circuit in a similar case:

> The law is settled that, following dispersal of a jury, once it has been dismissed, if we allow such attacks by individual members on the composite verdict of all twelve we can expect an unsettling of the system out of all proportion to any expectable improvement in the administration of justice. The opportunities for other abuses which would greatly exceed the possibly unfortunate consequences of not pursuing belated, post-verdict claims of intimidation by fellow jurors are obvi-

ous. In short, on the facts presented in the present case, the cure proposed is manifestly worse than the hypothetical, but unproven, disease.

*United States v. Barber*, 668 F.2d 778, 786–87 (4th Cir.) (citations and footnote omitted), *cert. denied*, 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982).

## IX. DARBY: SUFFICIENCY OF EVIDENCE

 Darby contends that the evidence against him was insufficient to prove him guilty of conspiring to import marijuana. In reviewing the sufficiency of the evidence, we must sustain the conviction if the evidence, viewed in the light most favorable to the government, is such that a reasonable trier of fact could find guilt beyond a reasonable doubt. *United States v. Lippner*, 676 F.2d 456, 466 (11th Cir. 1982); *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). To prove a charge of conspiracy under Title 21,

> the government must establish, beyond a reasonable doubt, that a conspiracy existed, that the defendant knew of it, and that he voluntarily participated in it. *United States v. Middlebrooks*, 618 F.2d [273] at 278 [5th Cir.1980]; *United States v. Littrell*, 574 F.2d [828] at 832 [5th Cir.1978]. The agreement between the coconspirators and the defendant need not be proved by direct evidence and may be inferred from concert of action. *United States v. Malatesta*, 590 F.2d [1379] at 1381 [5th Cir.1979]; *United States v. King*, 532 F.2d 505, 508 (5th Cir.), *cert. denied*, 429 U.S. 960, 97 S.Ct. 384, 50 L.Ed.2d 327 (1976). Further, it is not necessary for all coconspirators to know each other or to work together on every phase of the criminal venture. *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

*Lippner*, 676 F.2d at 466 (quoting *United States v. Garcia*, 672 F.2d 1349, 1369 (11th Cir.1982) (quoting *United States v. Wilson*, 657 F.2d 755, 758–59 (5th Cir.1981))).

 Emphasizing the number of government witnesses who did not testify against him and the questionable credibility of those who did, Darby asserts that the evidence failed to prove that he agreed to join the conspiracy. Taking the view most favorable to the government, we find ample evidence of Darby's guilt. A number of government witnesses, whose testimony was not inherently incredible, identified Darby as an active participant in the DC–6 episode. According to those witnesses, prior to the night on which the plane was originally expected, he was present at a discussion regarding plans for the offloading and agreed to serve as a lookout; on the night on which the plane was expected, he was at the landing strip in a lookout position; after the plane did not arrive as expected, he was present at a discussion regarding whether to go out to meet the plane a second night and agreed to do so; and on the night on which the plane finally arrived and the marijuana was offloaded, he drove a coconspirator to the landing strip and again assumed a lookout position. Moreover, the record indicates that he was paid handsomely for his efforts. We conclude that the jury reasonably could have found that Darby knowingly and voluntarily joined the conspiracy.

It is true that the importation conspiracy charged in the indictment covered the period from 1975 to 1982 and thus was not limited to the DC–6 episode. Darby's participation in the overall conspiracy, however, may be inferred from his involvement in the DC–6 episode. As this court pointed out in *United States v. Badolato*, 701 F.2d 915 (11th Cir.1983), "To be found guilty, a defendant need not have knowledge of all the details of the conspiracy, and may play only a minor role in the total operation." *Id.* at 920. Another court has observed:

> A single act may be "sufficient for an inference" that an individual is involved in a conspiracy; the "qualitative nature" of the act "viewed in the context of the entire conspiracy" determines whether that inference can be drawn in a particular case.

*United States v. Murray,* 618 F.2d 892, 903 (2d Cir.1980) (citations omitted). The evidence in this case suggests Darby's awareness of the size of the shipment and the use of a private plane, his acquaintance with several other participants and his personal contact with leaders of the conspiracy, one of whom assured the participants that the organization would take care of them in the event of arrest. Confronted with similar evidence, the predecessor of this court held that the jury could have rationally inferred that the defendant knew of the broader conspiracy. *See United States v. Hawkins,* 661 F.2d 436, 453–54 (5th Cir. Unit B 1981). Concluding that the evidence here permits the same inference, we sustain Darby's conviction.

## X. DARBY: MULTIPLE CONSPIRACIES

Finally, Darby asserts that the evidence at trial proved not one overall conspiracy, but several smaller conspiracies, including a conspiracy culminating in the DC–6 episode. He urges reversal on the ground that there was a prejudicial variance between the indictment and the proof, and on the ground that the district court's refusal to sever his trial constituted an abuse of discretion. Instead we affirm, for we reject Darby's premise that the government failed to establish a single conspiracy.

■ At the outset, we note that the factual issue underlying Darby's claim was adversely determined by the jury in this case. In *United States v. Michel,* 588 F.2d 986 (5th Cir.1979), the former Fifth Circuit made it clear that "[w]hether a scheme is one conspiracy or several is primarily a question for the jury." *Id.* at 995. Here the jury was instructed:

[P]roof of several separate conspiracies is not proof of the single overall conspiracy charged in the indictments, unless one of the several conspiracies which is proved is the single conspiracy which the indictment charges.

What you must do is determine whether the single conspiracy charged in the count of the indictment under deliberation existed between two or more conspirators. If you find that no such conspiracy existed, then you must acquit the defendants as to that charge.

However, if you are satisfied that such conspiracy existed, you must determine who were the members of that conspiracy.

If you find that a particular defendant is a member of another conspiracy, not the one charged in the indictment, then you must acquit that defendant. In other words, to find a defendant guilty, you must find that he was a member of the conspiracy charged in the indictment and not some other separate conspiracy.

In light of this instruction, we regard the jury's verdict of guilty as an implicit finding that the overall conspiracy charged in the indictment existed and that Darby participated in it.

■ Our review of the record confirms that there was but one conspiracy in this case. It is true that not every member of the conspiracy was involved in each of the major drug incidents. Yet "[i]t is not crucial to the existence of a conspiracy that each conspirator participate in every phase of the criminal venture." *United States v. Grassi,* 616 F.2d 1295, 1303 (5th Cir.1980). It is also true that some conspirators assumed greater responsibility and performed more tasks, but "[t]he plan does not become several plans simply because some members were cast in more vital roles than others or because certain members performed only a single function." *Michel,* 588 F.2d at 995. And while not all of the conspirators were mutually acquainted, it is not "necessary for each conspirator to have knowledge of the identity and role of each of his coconspirators." *Grassi,* 616 F.2d at 1303. The evidence in this case reveals the very hallmarks of a single conspiracy: a regularized pattern of activity involving a significant continuity of membership and directed toward a common goal. *See Grassi,* 616 F.2d at 1303; *Michel,* 588 F.2d at 995. Accordingly, we hold that there was neither a prejudicial variance nor an abuse of discretion.

On the basis of the foregoing analysis, we uphold the convictions and sentences of the four appellants. The judgments of the district court are AFFIRMED.